Todd M. Friedman (SBN 216752)
Adrian R. Bacon (SBN 280332)
Meghan E. George (SBN 274525)
Thomas E. Wheeler (SBN 308789)
LAW OFFICES OF TODD M. FRIEDMAN, P.C.
21031 Ventura Blvd, Suite 340
Woodland Hills, CA 91364
Phone: 323-306-4234
Fax: 866-633-0228
tfriedman@toddflaw.com
abacon@toddflaw.com
mgeorge@toddflaw.com
twheeler@toddflaw.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **LUCINE TRIM** individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**REWARD ZONE USA LLC;** DOES 1-10 Inclusive**,**<br><br>Defendant. | Case No. 2:20-cv-01027-SVW-KS<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THIRD AMENDED COMPLAINT** |

# TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................1

II. STATEMENT OF FACTS.....................................................................4

    A. Plaintiff's Allegations .................................................................4

    B. What Is an SMS Blaster? .............................................................5

    C. What Is A Random or Sequential Number Generator? ......................7

III. LEGAL STANDARDS ........................................................................9

IV. LEGAL ARGUMENT ........................................................................9

    A. Plaintiff States A Claim Under The ATDS Provisions of the TCPA...9

        1. Dismissing Plaintiff's Complaint Would Be Improper At The
            Pleadings Stage......................................................................11

        2. Facebook Did Not Disturb The TCPA's Prohibition On
            Campaign-Based Dialers Such As SMS Blasters Or
            Predictive Dialers ..................................................................12

        3. Plaintiff's Complaint Alleges Sufficient Facts To Survive A
            Rule 12 Motion ......................................................................16

    B. Plaintiff's Complaint Alleges Use of an Artificial and Prerecorded
        Voice...................................................................................17

    C. Plaintiff's Complaint Adequately Alleges The Text Messages Were
        Solicitations .........................................................................21

    D. The Proper Course Of Action, Should The Court Grant Defendant's
        Motion, Is A Grant Of Leave To Amend .....................................23

V. CONCLUSION....................................................................................23

# TABLE OF AUTHORITIES

Cases

*Ashland Hosp. Corp. v. Serv. Employees Int'l Union, Dist. 1199 WV/KY/OH*, 708 F.3d 737, 743 (6th Cir. 2013) ................................................................................19

*Atkinson v. Pro Custom Solar LCC*, No. SA-21-CV-178-OLG, 2021 WL 2669558 (W.D. Tex. June 16, 2021) .....................................................................................11

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ..........................................9

*Bell v. Portfolio Recovery Assocs., LLC*, No. 5:18-CV-00243-OLG, 2021 WL 1435264 (W.D. Tex. Apr. 13, 2021) ........................................................................11

*Callier v. GreenSky, Inc.*, EP-20-CV-00304-KC, 2021 WL 2688622 (W.D. Tex. May 10, 2021)...............................................................................................................2

*Callier v. GreenSky, Inc.*, No. EP-20-CV-00304-KC, 2021 WL 2688622 (W.D. Tex. May 10, 2021) .........................................................................................................16

*Caplan v. Budget Van Lines, Inc.*, No. 220CV130JCMVCF, 2020 WL 4430966 (D. Nev. July 31, 2020) .............................................................................................20

*Carl v. First Nat'l Bank of Omaha*, No. 2:19-CV-00504-GZS, 2021 WL 2444162 (D. Me. June 15, 2021) ..................................................................................................16

*Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913 (9th Cir. 2012) .......................22

*Coryell v. United States , Dep't of the Navy*, No. 218CV00593GMNNJK, 2019 WL 720972 (D. Nev. Feb. 20, 2019)...........................................................................9

*Daniel v. Five Stars Loyalty, Inc.*, No. 15-CV-03546-WHO, 2015 WL 7454260 (N.D. Cal. Nov. 24, 2015) .........................................................................................22

*Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021) ..........................1, 9, 13, 15

*Flores v. Adir International, LLC*, 685 Fed.Appx. 533, (9th Cir. March 24, 2017) ..........10

*Foman v. Davis*, 371 U.S. 178 (1962) ...............................................................23

*Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265 (3d Cir. 2013) ...........................20

*Garner v. Allstate Ins. Co.*, No. 20-C-4693, 2021 WL 3857786 at *4 (N.D. Ill. Aug. 30, 2021) ........................................................................................................12

*Grome v. USAA Savings Bank*, No. 4:19-CV-3080, 2021 WL 3883713 (D. Neb. Aug. 31, 2021) ........................................................................................................14

*Gross v. GG Homes, Inc.*, No. 3:21-cv-00271-DMS-BGS, 2021 WL 2863623 (S.D. Cal. July 8, 2021) ...............................................................................................2

*Gross v. GG Homes, Inc.*, No. 3:21-CV-00271-DMS-BGS, 2021 WL 2863623 (S.D. Cal. July 8, 2021) .............................................................................................11

*Huber v. Pro Custom Solar, LLC*, No. 3:19-CV-01090, 2020 WL 2525971 (M.D. Pa. May 18, 2020)...............................................................................................22

*Jance v. Home Run Offer LLC*, No. CV-20-00482-TUC-JGZ, 2021 WL 3270318 (D. Ariz. July 30, 2021) ..........................................................................................11

*Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005)................................................9

*Larson v. Homecomings Fin., LLC*, 680 F. Supp. 2d 1230 (D. Nev. 2009)........................9

*Marriott v. National Mut. Cas. Co.*, 195 F.2d 462 (10th Cir. 1952) .................................20

*Miles v. Medicredit, Inc.*, No. 4:20-cv-01186 JAR, 2021 WL 2949565 (E.D. Mich. July 14, 2021)...........................................................................................................................2

*Miles v. Medicredit, Inc.*, No. 4:20-CV-01186 JAR, 2021 WL 2949565 (E.D. Mo. July 14, 2021)..........................................................................................................................11

*Montanez v. Future Vision Brain Bank, LLC*, No. 20-CV-02959-CMA-MEH, 2021 WL 1697928 (D. Colo. Apr. 29, 2021).............................................................................11

*Reyes v. Lincoln Automotive Financial Services*, 861 F.3d 51, 58 (2nd Cir. 2017) ...........20

*Robinson v. Midland Funding, LLC*, No. 10-CV-2261-MMA-AJB, 2011 WL 1434919 (S.D. Cal. Apr. 13, 2011)..............................................................................................22

*Rotberg v. Jos. A. Bank Clothiers, Inc.*, 345 F. Supp. 3d 466 (S.D.N.Y. 2018) ...............21

*Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946  (9th Cir. 2009)...............................20

*Saunders v. Dyck O'Neal, Inc.*, 319 F. Supp. 3d 907 (W.D. Mich. 2018)........................20

*Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037 (9th Cir. 2017) ..............16, 20

*Vance v. Bureau of Collection Recovery LLC*, No. 10 C 6324, 2011 WL 881550, at *2 (N.D. Ill. Mar. 11, 2011) .............................................................................................12

*Weisbein v. Allergan, Inc.*, No. SACV200801FMOADSX, 2021 WL 1034979 (C.D. Cal. Mar. 16, 2021) ............................................................................................................22

Statutes

47 U.S.C. § 227 et. seq.............................................................................................3, 19, 21

Other Authorities

7 F.C.C. Rcd. 8752 (F.C.C. September 17, 1992))...........................................................14

Hearing Before the Subcommittee on Communications of the Committee on Commerce, Science and Transportation, United States Senate One Hundred Second Congress First Session July 24, 1991, Testimony of Robert Bulmash ..................................................15

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 18 FCC Rcd. 14014 (2003). ....................................................14

In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 23 F.C.C. Rcd. 559 (Jan. 4, 2008) ................................................................................16

*Webster's Ninth New Collegiate Dictionary* (1991).............................................1, 9, 17

Regulations

47 C.F.R. §§ 64.1200 ......................................................................................................15

7 FCC Rcd.  8752 (F.C.C. September 17, 1992)........................................................15, 19

## I.    **INTRODUCTION**

The Telephone Consumer Protection Act ("TCPA") forbids sending a text message with an automatic telephone dialing system ("ATDS") or using an artificial or prerecorded voice for marketing or advertising purposes without the express written consent of the called party.  In *Facebook, Inc. v. Duguid*, 141 S. Ct. 1163 (2021), the Supreme Court clarified that a random or sequential number generator must be used in the storing or the producing of the numbers to be called. The key dispute between the Parties and set before the Court is the use of the word "produce" in the statute. "Produce" does not mean create. It means "to offer to view or notice."  *See* https://www.merriam-webster.com/dictionary/produce; *see also Webster's Ninth New Collegiate Dictionary*, 938 (1991) (same). Accordingly, Plaintiff alleges and asserts that a device that uses a random or sequential number generator to produce phone numbers from a stored list is an automatic telephone dialing system by the plain language of the statute—and to read the word "produce" as instead meaning "create" is clearly in contravention of the plain language of the statute. The numerous unpublished decisions by other District Courts since *Duguid* cited by Defendant have made this exact error—substituting the word create for produce and thus re-writing the statute in broadening the narrow ruling of the Court in *Duguid*—and then cited to each other for support of their reading. Plaintiff respectfully requests the Court treat these cases as persuasive only—which they are—and come to its own conclusion regarding the plain language of the TCPA and the use of the word "produce."

Turning to the actual allegations which make clear the above assertions, the following is a Sequential Number Generator, which undersigned counsel are aware is programmed into the software code of a well-known SMS blasting platform:

```
730        if (!this.recordList.isEmpty()) {
731            this.recordNumber++;
732            final String comment = sb == null ? null : sb.toString();
733                                result  =  new  CSVRecord(this,
this.recordList.toArray(Constants.EMPTY_STRING_ARRAY), comment,
734                this.recordNumber, startCharPosition);
```

```
735        }
736        return result;
737    }[1]
```

These lines of code, and specifically the "++" in line 731, generate sequential numbers as part of a loop, used to store and produce telephone numbers, which are mass-blasted text messages to thousands of consumers in mere seconds, without human intervention.    This is publicly available open-source code integrated into the programming interface of a SMS blasters such as the one used by Defendant REWARD ZONE USA LLC ("Defendant") to robodial Plaintiff Lucine Trim ("Plaintiff").[2]  The sequential number generator in the code above is executed in the process of blasting text messages.   The program cannot function without executing the sequential number generator above.  In fact, this is how all SMS blasters, and indeed any campaign-based autodialers (including predictive dialers), have always been programmed.  This is what Defendant is alleged to have used to robodial Plaintiff, because Defendant was engaged in blind solicitation text blasting.

Plaintiff's allegations must be taken as true at this stage, as Plaintiff will not be able to demonstrate whether the code contains such number generators without discovery. Any system alleged to contain code like this meets the Supreme Court's test, because it uses number generators to store and produce telephone numbers. This system is inapposite to the system used in *Duguid*, which was a text response system that triggered

---

[1]    Available   here:   https://commons.apache.org/proper/commons-csv/apidocs/src-html/org/apache/commons/csv/CSVParser.html

[2] It is worth noting that Defendant does not contest the nature or function of the system as alleged in Plaintiff's Third Amended Complaint—which Defendant cannot do at the Motion to Dismiss stage anyway. To the extent there is a dispute about the actual functions of the system, such issue would clearly need to be handled at the Motion for Summary Judgment stage, as numerous other Courts have found. *Miles v. Medicredit, Inc.*, No. 4:20-cv-01186 JAR, 2021 WL 2949565, at*4 (E.D. Mich. July 14, 2021); *Gross v. GG Homes, Inc.*, No. 3:21-cv-00271-DMS-BGS, 2021 WL 2863623, at *1 (S.D. Cal. July 8, 2021); *Callier v. GreenSky, Inc.*, EP-20-CV-00304-KC, 2021 WL 2688622, at *5 (W.D. Tex. May 10, 2021).

a message to be sent to a phone number on file for an account after a certain action was taken on Facebook's website. Defendant's SMS blasting platform was an Automatic Telephone Dialing System as defined by 47 U.S.C. § 227(a)(1) as prohibited by 47 U.S.C. § 227(b)(1)(A).    This will be proven in discovery.   If Plaintiff is wrong, Defendant will prevail on summary judgment.   At this juncture, Plaintiff has alleged number generation, has presented a basis for this allegation, and even has presented code equivalent to what other similar dialers rely upon.

Secondarily, Plaintiff alleges the texts constituted an artificial and prerecorded voice. The TCPA is a remedial tort-based statute, designed to address a federal common law invasion of privacy and apply broad privacy rules to protect consumers from invidious and intrusive invasions into their lives.     Defendant's message was "prerecorded," was "artificial" and utilized a "voice" under a plain language reading. The statutory history, as discussed below, supports this reading.  While no Court has yet to reach this issue, the argument is supported by the jurisprudence within the Ninth Circuit on expanding the definition of "call" to include "text messages" in light of developments in technology—since text messaging did not exist at the time of first passage of the TCPA.

Finally, Defendant argues that Plaintiff has not alleged adequate facts to demonstrate that the solicitation text messages she received were, in fact, solicitations. Defendant's argument is misplaced at this stage, as Plaintiff has adequately pled facts to meet this low burden.  Additionally, to the extent the Court disagrees and finds that are not adequate facts as to the (c) claim, Plaintiff requests leave to amend as to this claim only.

Consumer privacy is ebbing away day by day.  This case operates as a vehicle to prevent further erosion.  The motion is procedurally premature, as well as legally and factually incorrect, and should accordingly be denied in full.

## II.   **STATEMENT OF FACTS**

**A.** **Plaintiff's Allegations**

Plaintiff has filed a class action alleging widespread violations by Defendant of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et seq.*  Plaintiff alleges Defendant sent her automated solicitation text messages with an intrusive SMS blasting platform, which qualifies as an automated telephone dialing system, to her cell phone. Third Amended Complaint ("TAC"), Dkt. No. 33 ¶¶ 19, 22.  Such messages were drafted in advance by Defendant, which dictated the prerecorded content and parameters of the sending of messages to consumers.  *Id*. at ¶ 36-39.  The system used to send messages was an SMS blasting platform, which sends generic impersonal template messages via automated dialing campaigns.  *Id*. at ¶¶ 22-36.  Plaintiff alleges that the SMS blasting platform utilized random or sequential number generators to store and produce telephone numbers.  *Id*. at ¶ 24-25.  Plaintiff provides examples above of known code in other SMS blasting platforms.  See Apache Code *Infra*.

Plaintiff alleges that the SMS blaster used a random or sequential number generator to store and produce telephone numbers and then dialed those stored lists in an automated fashion without human intervention.  *Id*. at ¶¶ 24-26.  These campaigns were agentless, and did not involve a live agent, but rather a text blast sent by a computer. *Id.* They also involve messages that were drafted in advance and sent out automatically based on pre-programmed parameters. *Id.* at ¶ 36. Plaintiff further alleges that such systems utilize algorithmic dialing, which is how predictive dialers and other campaign-based autodialers that use sequential number generators operate. *Id.* at ¶ 24-25.  These campaigns were preprogrammed by Defendant, and SMS blaster system was used to mass dial lists of consumers using number generators that indexed those lists, stored them using either random or sequential number generators (most likely sequential like the Apache code above), and then relied on similar number generators to produce the stored numbers from temporary memory to the dialer to be called. *Id.* at ¶¶ 24-34. Thus, Plaintiff alleges that Defendant's SMS blasts were sent using an ATDS as prohibited by

47 U.S.C. § 227(b)(1)(A).

As a separate basis for liability, Plaintiff alleges that the SMS blasts constituted both an artificial and prerecorded voice, as prohibited by 47 U.S.C. § 227(b)(1)(A). Plaintiff offers dictionary definitions of the terms "artificial" "prerecorded" and "voice" which support his reading of the statute. *Id.* at ¶¶ 35, 38. Plaintiff alleges that the text messages were not sent by a live agent, and thus were agentless and automated, sent by computerized campaigns and preprogrammed and written in advance to be sent out *en masse*. *Id.* at ¶¶ 34-38. Accordingly, these messages meet both the definition of artificial, and prerecorded. Plaintiff also alleges that the messages were sent via a voice, which need not, according to the dictionary, involve oral utterances. Rather, a voice can be a communication transmitted by other forms, i.e. any instrument or medium of expression. Plaintiff alleges that a text message is an instrument or medium of expression of Defendant's telemarketing communications. On these grounds, Plaintiff alleges that Defendant mass blasted prerecorded artificial voice messages with an ATDS to Plaintiff and other similarly situated consumers, without prior express consent. *Id.* at ¶¶ 33-39. Plaintiff further alleges that these unwanted messages directly invaded her right to privacy.

Finally, Plaintiff has alleged that she multiple text messages in or around April 2020 soliciting Defendant's business and that she received at least three such text messages from Defendant within a 12-month period. *Id.* at ¶¶ 44, 46. Plaintiff's phone number had been on the Do-Not-Call Registry for over thirty (30) days prior to Defendant's initial text message. *Id.* at ¶ 43. Accordingly, Defendant's text messages also violated the do-not-call provisions of the TCPA, 47 U.S.C. § 227(c).

**B.** **What Is an SMS Blaster?**

An SMS blaster like the one used by Defendant to text Plaintiff utilizes campaigns, which are preprogrammed to store and produce telephone numbers to be called by the platform, much in the same way as a predictive dialer. Predictive dialer functionality is described by the FCC. *In re Rules and Regulations Implementing the Telephone*

*Consumer Protection Act of 1991*, Report and Order, 18 FCC Rcd. 14014, 14115 ¶¶ 8 fn 31, 131, and 146 (2003) ("2003 FCC Order").

In plain English, the following is description of an SMS blaster typically operates: A dialer operator accesses a database of consumer contact information, which is typically contained in a text delimited file, either in a CSV file, text file, Microsoft Excel, or Microsoft Access file. In essence, this is a spreadsheet, containing rows and columns of data, which includes telephone numbers. The operator will load this data set into the dialing platform, usually through an online web portal. The dialing system will cut the data set into individual lines, unique to each telephone number with an assigned row using a parser. A random or sequential number generator (typically sequential) will generate numbers, and assign those numbers to the data, during a process called indexing. The program will then "store" the data in a temporary cache or RAM memory location accessible to the dialer. A random or sequential number generator is simultaneously used to select and produce the indexed telephone numbers to the dialer. Once the number generator corresponds to a matching number in the stored list, that telephone number will be "produced" from storage to the dialer, which then automatically dials that telephone number. Thus, the system is literally both storing and producing telephone numbers to be called by the campaign autodialing systems. Storage and production occur automatically, without any organic triggering event by a human. The aforementioned process determines which order and sequence the list of telephone numbers are to be stored, produced, and automatically dialed, as well as the rate at which this process occurs.

To illustrate this using a real-world example provided to undersigned counsel by a software engineer fluent in Java who reviewed dialer code, imagine a list of numbers as a lengthy sheet of lined notebook paper. A parser cuts this into strips, and stores it in a paper tray attached to a scanner. Each strip of paper is assigned a row number, and a telephone number. The scanner uses a program to generate numbers, either sequentially or randomly. That generator is hooked to the paper feed, which instructs the scanner to match the generated number, to the corresponding strip of paper in the tray, and then

produce that telephone number from the stored list through the scanner, and out the other side, at which time the scanner is dialing the telephone number on that strip of paper. Now imagine a scanner that accomplishes this with a tray containing thousands of pages of paper in the blink of an eye. Once the tray is empty, the dialing campaign is complete. The program for the dialing campaigns is pre-set like a sprinkler timer to dial the phone numbers at pre-set intervals and pre-set time periods. This process is sometimes referred to as algorithmic dialing. It is the same process by which predictive dialing campaigns are programmed, except that predictive dialers also account for a live person having to be connected after this occurs. Texts do not require this component and can be blasted out in higher volumes than predictive dialers.

C. **What Is A Random or Sequential Number Generator?**

A random number generator or sequential number generator are common programming tools used by software engineers when designing computer software, to automate certain functions in certain ways that would otherwise need to performed by human hand. This term was not invented by Congress. It does not mean the same thing as "telephone number generation."[3] Any software engineer will agree. Number generators are a widely understood tool of software engineers. Lawyers, regulators and courts have bungled this over years of uninformed advocacy.

Undersigned counsel studied the code used to program SMS blasters with the assistance of software engineers fluent in Java and found they execute code that relies upon number generation to store and produce numbers to be called by the dialer. For instance, a common "parser" used in SMS blasting coding in an SMS blaster integrates

---

[3] The statutory text of 47 § 227(a)(1) states "The term "automatic telephone dialing system" means equipment which has the capacity— (A)to store or produce telephone numbers to be called, using a random or sequential number generator..." The use of the phrase "telephone numbers to be called" in the same code section as "number generator" and the key distinction between the term "telephone number" and "number" thereafter indicate that a number generator is not referring to a telephone number generator. Otherwise, the statute would have said "to store or produce telephone numbers to be called, using a random or sequential [telephone] number generator."

the open-source Apache code into its autodialing SMS blaster platform quoted *infra*. These lines of code, and specifically the "++" in line 731, represent an operator token that generates sequential numbers as part of a loop. This loop is used to select which number from the CSV file, will be dialed, and produce that number to the dialer using a CSV parser. Such programs can dial thousands of consumers in mere seconds, without any human intervention, based on whatever parameters are targeted by the operator of the dialing platform. The sequential number generator in the code above is executed in the process of mass SMS blasting. The program cannot function, and therefore cannot dial any phone numbers at all, without executing such a sequential number generator.

All SMS blasters rely on random or sequential number generators to instruct the data set to store and produce telephone numbers to the dialer. Without this key component, a dialing campaign would require an agent to manually place the call, via organic decision making, or as was the case in *Facebook*,[4] through some other organic one-to-one triggering event that instructs the dialer to place the call. <u>Plaintiff's allegations must be taken as true</u>. Plaintiff will not be able to demonstrate whether the SMS blasting system utilizes such random or sequential number generators without conducting discovery and obtaining the code for the dialing platform.

---

[4] In *Facebook*, that organic event was a human being trying to gain access to a user's Facebook account without authorization, and Facebook's system being programmed to notify the owner of the account when this happened. *Duguid* should never have been subject to an appeal, because the system unquestionably did not use random or sequential number generation. Just because a robot sent the message does not mean random or sequential number generation is involved. Robots can be programmed to complete isolated tasks by their operators upon the occurrence of an isolated organic triggering event. If there are a lot of organic triggering events, then this could optically appear to the untrained eye to be mass dialing, but it is not. The key distinction here is that the code in SMS blasters use number generation and dialing campaigns to decide who to dial, while the code in the *Facebook* platform does not and could never do so, and so it could never fit within the plain language definition of an ATDS under the statutory text. The platform used here sent out impersonal advertisements to Plaintiff and seemingly thousands of other individuals to solicit Defendant's services. Such system which "blasts" messages to many people necessarily uses a random or sequential number generator as alleged.

Defendant's Motion is premature.  Based on detailed discussions with experts and years of litigation and expertise surrounding such technology, including having reviewed code of similar systems, Plaintiff, and her counsel, have a sufficient good faith basis to make these allegations, and assert that if the system is a traditional SMS blaster, then it will rely on this coding, which will execute number generators to store and dial telephone numbers, including the dialing of Plaintiff's phone number.  And so, it follows that this is an issue best reserved for summary judgment, because Plaintiff's allegations fall squarely within what the Supreme Court said was an ATDS.

### III.   LEGAL STANDARDS

A complaint need only "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  On a motion to dismiss, the court construes the complaint in the light most favorable to the non-moving party, accepts all well-pled facts as true, and draws all inferences in the non-moving party's favor.  *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005); *see also Coryell v. United States, Dep't of the Navy*, No. 218CV00593GMNNJK, 2019 WL 720972, at *1 (D. Nev. Feb. 20, 2019).  "A claim is facially plausible when the plaintiff's complaint alleges facts that allows the court to draw a reasonable inference that the defendant is liable for the alleged misconduct."  *Larson v. Homecomings Fin., LLC*, 680 F. Supp. 2d 1230, 1233 (D. Nev. 2009).

### IV.   LEGAL ARGUMENT

### A.   Plaintiff States A Claim Under The ATDS Provisions of the TCPA

*Facebook* does not hold that every TCPA case should be thrown out on the pleadings.  All it says is that a dialing system must have the capacity to store or produce telephone numbers to be called, using a random or sequential number generators to be an ATDS, i.e. exactly what the plain language of the statute already says.  It further contemplates that such number generators can be used to dial stored lists of telephone

numbers, because platforms like the one in this case literally "produce"[5] the telephone number from that list, to the dialer.[6] Plaintiff's Third Amended Complaint alleges facts which, when viewed, in the light most favorable to Plaintiff, plausibly suggest that Defendant contacted her on his cellular telephone through the use of an ATDS under the interpretation given by the Supreme Court's *Facebook* decision. Accordingly, Plaintiff requests that this Court deny Defendant's Motion to Dismiss and to allow Plaintiff to seek written discovery regarding the exact specifications of the dialing system.

Without the benefit of discovery, Plaintiff can only plead facts based upon personal knowledge of the texts she received, along with work product from her counsel as to the functionality and coding of other similar dialing platforms that facially operate in the same manner. In order to truly evaluate Plaintiff's claims, an analysis of the dialing system is crucial. Accordingly, conclusions regarding Plaintiff's TCPA claims are more appropriately drawn at summary judgment, after discovery regarding the specifications of the dialer. Courts that dismissed similar claims filed by undersigned counsel have had their decisions reversed, even where less detail was pled. *Flores v. Adir International, LLC*, 685 Fed.Appx. 533 (9th Cir. March 24, 2017). The same result would occur here if Defendant has its way.

The clear allegations in the Complaint would have to be entirely ignored to side with Defendant. Plaintiff requests the Court deny Defendant's Motion to Dismiss.

---

[5] Miriam Webster's Dictionary's first definition of "Produce" is "to offer to view or notice." See https://www.merriam-webster.com/dictionary/produce; *See also Webster's Ninth New Collegiate Dictionary*, 938 (1991) (same).

[6] Undersigned counsel filed an Amicus Brief in *Facebook* about predictive dialers. The Supreme Court had the opportunity to subsequently address predictive dialers but chose to not do so. This is important because predictive dialers, like SMS blasters, store telephone numbers to be produced and thereafter dialed automatically by a campaign at a later time, using random or sequential number generators. SMS blasters and predictive dialers are programmed in a virtually identical fashion. This is why many dialer companies offer both predictive dialer and SMS blasting options with their platforms. They rely on the same integrated code to operate.

**1. Dismissing Plaintiff's Complaint Would Be Improper At The Pleadings Stage**

Plaintiff has not had the opportunity to engage in discovery, without which it is difficult to discern what Plaintiff could allege in support of her ATDS claims, aside from her experiences receiving Defendant's texts. Those experiences informed Plaintiff's understanding of how Defendant solicits consumers. Plaintiff anticipates gathering further information about the dialing platform in discovery, which would narrow the issues in dispute.

A survey of post- *Facebook* decisions shows that district courts consistently favor allowing plaintiffs to proceed with discovery over dismissing their claims at the pleadings stage.[7]   Recently, an Illinois court held that an allegation that the defendant used a

---

[7] *See Miles v. Medicredit, Inc.*, No. 4:20-CV-01186 JAR, 2021 WL 2949565, at *4 (E.D. Mo. July 14, 2021) ("Additional factual details about Medicredit's dialer…might be helpful but are not required at the pleading stage […] the Court finds Plaintiff has pled enough facts to proceed with discovery, at which time he will have the opportunity to discover the precise technology that was used at the time of the alleged TCPA violations"); *Bell v. Portfolio Recovery Assocs., LLC*, No. 5:18-CV-00243-OLG, 2021 WL 1435264, at *1, fns. 4-5 (W.D. Tex. Apr. 13, 2021) ("the Court believes that any resolution of dispositive motions in this case will almost certainly involve some analysis regarding the capabilities of the device in question…"); *Montanez v. Future Vision Brain Bank, LLC*, No. 20-CV-02959-CMA-MEH, 2021 WL 1697928, at *7 (D. Colo. Apr. 29, 2021) ("While the Supreme Court's decision elucidates the definition of an ATDS, that holding will prove far more relevant on a future motion for summary judgment than it does now."); *Gross v. GG Homes, Inc.*, No. 3:21-CV-00271-DMS-BGS, 2021 WL 2863623, at *7 (S.D. Cal. July 8, 2021) ("Plaintiff need not include additional details concerning the process by which Defendant's device stores and produces phone numbers. Plaintiff need not describe the technical details of Defendant's alleged ATDS at this stage. The issue is appropriately addressed following discovery and on a motion for summary judgment."); *Atkinson v. Pro Custom Solar LCC*, No. SA-21-CV-178-OLG, 2021 WL 2669558, at *1 (W.D. Tex. June 16, 2021) ("As a practical matter, no plaintiff will have personal knowledge of the defendant's telephone system at the pleadings stage. Only the defendant has that knowledge. However, Plaintiff had pled enough facts to proceed with discovery…"); *Jance v. Home Run Offer LLC*, No. CV-20-00482-TUC-JGZ, 2021 WL 3270318, at *3 (D. Ariz. July 30, 2021) ("whether a defendant has an ATDS is often a fact exclusively within the defendant's possession…courts have acknowledged the difficulty a plaintiff faces in pleading the existence of such a system with specificity because it is a factual question that is not properly resolved without

1  predictive dialer to autodial their phone without consent was sufficient at the pleadings to
2  survive a motion to dismiss, because the coding and intricacies of the dialing system
3  would not be readily apparent to a consumer, and it was reasonable to infer that such a
4  system used random or sequential number generators to store or dial telephone numbers.
5  *Garner v. Allstate Ins. Co.*, No. 20-C-4693, 2021 WL 3857786 at *4 (N.D. Ill. Aug. 30,
6  2021) (citing *Vance v. Bureau of Collection Recovery LLC*, No. 10 C 6324, 2011 WL
7  881550, at *2 (N.D. Ill. Mar. 11, 2011)). The same logic applies to SMS blasters, which
8  operate in a nearly identical fashion and rely on similar code as predictive dialers to store
9  and produce telephone numbers to be called. These courts are following the correct
10 procedure of the Federal Rules. Defendant invites the Court to commit procedural error.

11 **2. Facebook Did Not Disturb The TCPA's Prohibition On Campaign-Based**
12 **Dialers Such As SMS Blasters Or Predictive Dialers**

13 Defendant overstates the extent to which *Facebook* rolled back the definition of
14 ATDS. The reality is that the ATDS definition in Facebook is identical to the Ninth
15 Circuit's common law definition from the 2009 *Satterfield* decision. The law has
16 remained relatively consistent and yet there is a great deal of misunderstanding
17 surrounding this issue because very few of the attorneys who are arguing about this
18 understand what a random or sequential number generator actually is and are simply not
19 articulating the issue correctly. This is why Plaintiff sets forth the illustrations above.
20 Number generators do not generate telephone numbers. They generate numbers as an
21 incredibly common programming tool used by software engineers when creating
22 computer programs, to automate functionality that otherwise would have to be performed
23 organically. This saves time and money because computer processers are faster than
24 people and reduce labor cost.

25 However, number generation is **not** the same as automation. It is a very specific
26 type of automation from a programming perspective, which effectively comes down to

27
28 formal discovery or at this stage of the proceedings.") (internal quotations and citations
   omitted).

this question – can the system itself decide to dial a particular phone number in a particular order, or does a human need to decide this and participate in the dialing? Where number generators come in with respect to autodialers is that they are used by the software engineers who write code for dialing platforms to automate the dialing system, i.e. in conjunction with storing the lists of telephone numbers to be called, and producing those telephone numbers from the list to the dialing system. This simply means that the system has the capacity to dictate which telephone number to dial, without a person being involved in that process. Modern cell phones do not have this capability, Facebook's dialing system did not have this capability, regular desktop telephones do not have this capability. And so, the *Facebook* concerns are not present with this commonsense interpretation. Indeed, the only reason anyone ever argues otherwise is because they do not understand what a random or sequential number generator is and have never analyzed dialer code or spoken to a programmer about any of this. Defendant's system, as alleged by Plaintiff, **does** have this capacity, because this is how any campaign-based autodialer operates, which includes SMS blasters, as well as predictive dialers.

In *Facebook*, the Supreme Court held that "[t]o qualify as an 'automatic telephone dialing system,' a device must have the capacity either to store a telephone number using a random or sequential generator ***or*** to produce a telephone number using a random or sequential number generator." 141 S.Ct. at 1163 (emphasis added). The Court further observed that "advances in automated technology made it feasible for companies to execute large-scale telemarketing campaigns at a fraction of the prior cost, dramatically increasing customer contacts. Infamously, the development of "robocall" technology allowed companies to make calls using artificial or prerecorded voices, obviating the need for live human callers altogether." *Id.* at 1167. The Court determined that the texting platform used by Facebook, which sent one-to-one text messages to individuals upon a triggering event, was not the type of technology targeted by Congress and presented real world problems of overbreadth because such systems "could affect ordinary cell phone owners in the course of commonplace usage, such as speed dialing or sending automated

text message responses." *Id.* at 1171.  However, the Court also referenced the possibility that "an autodialer might use a random number generator to determine the order in which to pick phone numbers from a pre-produced list.  It would then store those numbers to be dialed at a later time." *Id.* at 1172 n.7.[8]  This is an inarticulate way of describing how number generation works, but the point is clear – SMS blasters are in.

To illustrate this point further, the legislative history and early FCC rulings on the TCPA support the conclusion that *Facebook* did not disturb the TCPA's application to predictive dialers. Predictive dialers, like SMS blasters, dialed databases of telephone numbers in an automated fashion using campaign features, which rely upon random or sequential number generators to both store and produce the telephone numbers to be called.  Similar to SMS blasters, "predictive" dialers also call from a stored list of phone numbers, but utilize algorithms to "predict" when an agent will receive a live answer. This is described in the 2003 FCC Order cited above, as well as in the Amicus brief filed by undersigned counsel in the Facebook matter.  *See* Request for Judicial Notice Ex. A. Simply put, predictive dialers are autodialers.[9]

---

[8] Although there is not much post- *Facebook* caselaw interpreting footnote 7, one district court recently held that a system which automatically re-sequenced numbers on a campaign list would have qualified as an autodialer, if not for the fact that there was no evidentiary showing in the record by plaintiff that it did so by using a random or sequential number generator. *See Grome v. USAA Savings Bank*, No. 4:19-CV-3080, 2021 WL 3883713, at *5 (D. Neb. Aug. 31, 2021).  The natural extension of this order is that if the plaintiff had shown evidence of programming code for the dialing system that utilized a random or sequential number generator in the method Plaintiff argues herein, that the court's order would have gone the other direction.  This is insightful and Plaintiff believes, is correct.

[9] Even the FCC's first ruling on the TCPA in 1992 recognized the importance of restrictions on equipment such as predictive dialers. Referring in part to "predictive dialers" to place live solicitation calls (7 F.C.C. Rcd. 8752, 8756 (F.C.C. September 17, 1992)), the FCC then opined that "both live [referring again to live solicitation calls, such as with a predictive dialer] and artificial or prerecorded voice telephone solicitations should be subject to significant restrictions" (*Id.*). Since 2003, the FCC has long held, definitively, that predictive dialers qualify as an ATDS under the TCPA. *See* 2003 FCC Order at ¶¶ 131-134.

The terms "predictive dialer," "SMS blaster" and "campaign" never appear in the Supreme Court's ruling in *Facebook*, nor does the order ever suggest that campaign-based dialers are not an ATDS.[10]   It is also worth mentioning that Facebook was not using an SMS blaster, but a completely different type of system that sent responsive text messages based on an organic triggering event.  The Supreme Court did not say that SMS blasters are not an ATDS.  They were not presented with that question.  They were not presented with that fact pattern, or the system specifications or the code for such a system.  Indeed, the ruling suggests that reading the Supreme Court's order as precluding an ATDS finding as to such technology would "greatly overstate[] the effects of accepting Facebook's interpretation." *Id.* at 1173. This is consistent with the history of autodialers, which have been dialing stored lists of numbers since the 1970s.[11]   Predictive dialers, which dial stored lists of numbers using algorithms, have been prohibited since the passage of the TCPA, and have historically been prohibited by the FCC ever since.[12] And if predictive dialers are an ATDS, so too would an SMS blaster be an ATDS because they function the same, both dial databases using campaigns, and both rely on the same programming code, i.e. the same number generators.

Further, reading *Facebook* to preclude dialing systems that dialed stored lists of

[10] The Supreme Court had every opportunity to discuss predictive dialers in *Facebook*, because undersigned counsel put the issue before the Court in the briefing for the *Facebook* decision. Plaintiff's Request for Judicial Notice, Ex. A.  Why would nine Justices ignore this issue entirely?  Because predictive dialers were not before the Court, and there was no legitimate question that Facebook's system did not rely on campaign dialing or operate by way of number generation.

[11] *See* extensive discussion of predictive dialer patents in RJN Ex. A.

[12] *See* Hearing Before the Subcommittee on Communications of the Committee on Commerce, Science and Transportation, United States Senate One Hundred Second Congress First Session July 24, 1991, Testimony of Robert Bulmash and Steve Hamm at pgs 11, 16, 19, 24-25, and 27; 7 FCC Rcd.  8752, 8756 (F.C.C. September 17, 1992) at ¶¶ 8-9; *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991,* Report and Order, 18 FCC Rcd.  14014, 14115 ¶¶ 131-134 (2003) at ¶¶ 8 fn 31, 131, and 146; see also 47 C.F.R. §§ 64.1200(a)(5-7) (prohibiting predictive dialing with certain abandonment rates, i.e. technology which automatically dials stored lists through campaigns).

1   numbers using algorithmic data pulls would render the consent requirements set forth

2   under 47 U.S.C. § 227(b)(1)(A) irrelevant surplusage. Courts and the FCC have generally

3   held that consent is an affirmative defense to any otherwise-violative conduct under the

4   TCPA. *Van Patten v. Vertical Fitness Group, LLC*, 847 F.3d 1037 (9th Cir. 2017); In the

5   Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991, 23

6   F.C.C. Rcd. 559, 565 (Jan. 4, 2008). An autodialer that is required to self-generate its

7   own lists of numbers to dial, as opposed to dialing from a stored list, could **never** be used

8   in compliance with the TCPA because there is by definition a lack of consent from an

9   individual whose number is randomly generated. These two concepts are mutually

10  exclusive.

11  ### 3.  Plaintiff's Complaint Alleges Sufficient Facts To Survive A Rule 12 Motion

12  Given the context detailed above, when viewing the record in the light most

13  favorable to Plaintiff, it is clear that Plaintiff has pled facts that make it plausible

14  Defendant's system has the capacity to both store and produce a telephone number using

15  a random or sequential number generator. Such an inference is plausibly drawn where a

16  plaintiff alleges ATDS violations upon information and belief.  *See Carl v. First Nat'l*

17  *Bank of Omaha*, No. 2:19-CV-00504-GZS, 2021 WL 2444162, at *12, fn. 10 (D. Me.

18  June 15, 2021) ("[T]here is a trialworthy question as to whether the Voice Portal system

19  had the capacity to store a telephone number using a random or sequential number

20  generator. […] *Facebook* suggested that an ATDS could potentially fall under TCPA if it

21  use[s] a random number generator to determine the order in which to pick phone numbers

22  from a preproduced list [and] then store[s] those numbers to be dialed at a later time.")

23  (internal quotations omitted); *Callier v. GreenSky, Inc.*, No. EP-20-CV-00304-KC, 2021

24  WL 2688622, at *5 (W.D. Tex. May 10, 2021) ("[I]t is not unreasonable to infer from the

25  pleadings that Defendant relied on a sequential number generator to place its calls.

26  Indeed, such an inference is appropriately drawn at the pleadings stage, where the Court

27  is required to credit Plaintiff's account, [and] view the facts in the light most favorable to

28  Plaintiff…").

Plaintiff plausibly alleges that Defendant utilized an ATDS or, stated differently, "equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator; and to dial such numbers." Without the benefit of discovery, Plaintiff lacks the ability to specifically identify the code in Defendant's system, however, under the pleading standards of the TCPA, Plaintiff has alleged sufficient facts to plausibly suggest that Defendant's system qualifies as an ATDS under the new interpretation set forth in *Facebook*. For these reasons, Plaintiff's Complaint should not be dismissed, and Plaintiff should be given the opportunity to discover the exact specifications of Defendant's dialing system.

**B. <u>Plaintiff's Complaint Alleges Use of an Artificial and Prerecorded Voice</u>**

Defendant's SMS blasts are artificial and prerecorded voices, in addition to having been sent via an ATDS.  This is based on a plain language interpretation, as well as the statutory history, and cannons of construction regarding remedial statutes like the TCPA.  The starting point of statutory interpretation lies in the plain language.  Plaintiff bases his allegations on definitions from the dictionary of "artificial" "prerecorded" and "voice."  Those definitions are as follows: Artificial - "humanly contrived often on a natural model: man-made <an [artificial] limb> <[artificial] diamonds>."  Another definition is "lacking in natural or spontaneous quality."  *Webster's Ninth New Collegiate Dictionary*, 106 (1991).  Prerecord - "to record in advance of presentation or use."  Record means "to set down in writing."  *Id*. at  984.  Voice - "an instrument or medium of expression."  Another definition provided is "to express in words."  *Id*. at  1320.

Defendant's text messages were artificial.  Like a traditional prerecorded artificial oral voice phone call, Defendant's messages were not organic.  An organic text message would involve a live person sending it.  Organic text messages are interactive – one can respond to them and receive a natural response back from a person, not a machine.  Defendant's message was drafted in advance and stored in a computer and blasted out to the masses at a later preprogrammed time.  It lacked spontaneous quality.  Its transmission was incapable of natural alteration, or natural response.  The timing of when

and how it was to be sent were determined by a computer, not a person. A robot sent the message. Clearly it is artificial.

Defendant's text messages were prerecorded. A person wrote the content of a mass telemarketing message in advance, and then programmed the SMS blasting computer to send this message out at a later time. This is the literal definition of prerecorded.

Defendant's only challenge is whether the transmission of an artificial and prerecorded text message constitutes a "voice." It is true that there are other definitions of "voice" which hinge on oral utterances, vocal cords, and the like. However, there are dictionary definitions that extend voice to other forms of communication. An illustrative question frames this issue: does a deaf and mute person not have a voice under its common parlance? Can they not voice opinions, or concerns? Can they speak or express themselves using other tools as their voice? They clearly can and do. That is why, in part, there are multiple definitions of the word voice.

There are several reasons to believe the definition of voice targeted by Congress should be interpreted broadly. The purpose of the TCPA is to protect consumer privacy from intrusive telephone communications. The legislative history is clear that the original focus on prerecorded voice technology prohibition was the fact that such communications involved agentless calls.

> "NACAA officials concluded that complaints about machine-generated
> telephone calls is one of the fastest growing categories of complaints. The
> public at least deserves the right to slam the telephone receiver down and
> have a real person on the other end of the line bear just how frustrated and
> angry those calls make people and should also have the ability to limit these
> intrusive calls."

*See* RJN Ex. B. at pg 11. Mr. Hamm went on to distinguish agentless (artificial/prerecorded calls) from those which were live operator assisted (ADADs).[13]

---

[13] For purposes of this analysis, ADAD is historically equivalent to ATDS.

*Id*. at 11-12.   Indeed, the legislative history numerously emphasizes that the artificial/prerecorded voice prohibitions hinge on the fact that the calls are agentless, i.e. the lack of having a conversation with someone on the other side who can respond to questions or frustration, and instead receiving a static, one-sided message.[14]   Congress was being presented with two distinct privacy threats – automated calls sent in high volumes with a computer involving a live agent (campaign/predictive dialers), and agentless calls where consumers were deprived of the dignity of expressing their frustration because only a computer lay at the other end of the telephone (artificial/prerecorded voice).[15]   The goal of the statute is served by interpreting "voice"

---

[14] *See* RJN Ex. B at 9 ("[O]ne of the constant refrains that I hear . . . from consumers and business leaders who have gotten these kinds of computerized calls is they wish they had the ability to slam the telephone down on a live human being so that that organization would actually understand how angry and frustrated these kinds of calls make citizens, and slamming a phone down on a computer just does not have the same sense of release."); 137 Cong. Rec. S18785-01, S18786 (Nov. 27, 1991) ("Autodialers have grown in use because, as a New York Times story put it, 'they don't eat, they don't sleep and their feelings never get hurt when people curse them or hang up on them. They just call and call and call-each one up to 1,500 times a day.'"); 137 Cong. Rec. H11307-01, H11312 (Nov. 26, 1991) ("[R]obotic calls by machines such as autodialers and computer-generated voices to be a much greater threat to the privacy of our homes than calls by live operators. At least you can vent your anger to a real person if they have interrupted your dinner. You can ask them questions and hold them accountable to some extent.").

[15] The FCC agreed with this distinction.  In 1992, the FCC's first ruling on the TCPA recognized the importance of restrictions on equipment two separate types of equipment: "live," which were generally understood to be predictive dialer calls, and "artificial or prerecorded voice" which were characteristically agentless.  In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 7 FCC Rcd. 8752, 8756-57 (F.C.C. September 17, 1992).  Similarly, the Sixth Circuit held, "Congress drew an explicit distinction between 'automated telephone calls that deliver an artificial or prerecorded voice message' on the one hand and 'calls placed by 'live' persons' on the other." *Ashland Hosp. Corp. v. Serv. Employees Int'l Union, Dist. 1199 WV/KY/OH*, 708 F.3d 737, 743 (6th Cir. 2013).   Additionally, the FTC has observed that "prerecorded calls are by their very nature one-sided conversations, and if there is no opportunity for consumers to ask questions, offers may not be sufficiently clear for consumers to make informed choices before pressing a button or saying yes to make a purchase." 73 FR 51164-01, 51167 (Aug. 29, 2008).  It should also be pointed out that it is well accepted

under a broad definitions offered by the dictionary.

The TCPA is a remedial statute intended to protect consumers from unwanted automated telephone calls and messages, it should be construed in accordance with that purpose. *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1047 (9th Cir. 2017) (citing *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 270 (3d Cir. 2013)). Because the TCPA is a remedial statute, it "should be construed broadly to effectuate its purposes." *Caplan v. Budget Van Lines, Inc.*, No. 220CV130JCMVCF, 2020 WL 4430966, at *3 (D. Nev. July 31, 2020) (citing *Saunders v. Dyck O'Neal, Inc.*, 319 F. Supp. 3d 907, 911 (W.D. Mich. 2018)). Any ambiguities in the statutory text must be construed in the consumers' favor, under well-understood canons of construction. *Reyes v. Lincoln Automotive Financial Services*, 861 F.3d 51, 58 (2d Cir. 2017). A remedial statute "is entitled to a broad interpretation so that its public purposes may be fully effectuated." *Marriott v. National Mut. Cas. Co.*, 195 F.2d 462, 466 (10th Cir. 1952). The dueling dictionary definitions as to the term "voice" are such an ambiguity. Construing the ambiguity in Plaintiff's favor serves the policy underlying the prohibition on prerecorded and artificial communications. This is similar to the analysis done by the Court in *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009) in finding that "call" under the TCPA includes text messages because such defiition it "is consistent with the dictionary's definition of call in that it is defined as 'to communicate with or try to get into communication with a person by telephone' " and because it "is also consistent with the purpose of the TCPA—to protect the privacy interests of telephone subscribers."

A voice, covers any telephonic communication covered by the statute pursuant to 47 U.S.C. § 227(b)(1)(A). If texts are calls, then texts are voices. Clearly, the emphasis of the statute was on prohibiting one-sided conversations. SMS blasts are just that.

---

that text messages are "calls" under the statutory text. *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 667 (2016); *Gager v. Dell Financial Services, LLC*, 727 F.3d 265, 269 n.2 (3d Cir. 2013). Defendant's SMS blasting platform accomplishes an identical goal of transmitting agentless one-sided messages.

Plaintiff could only slam the phone down on a robot, just like the consumers that Mr. Hamm pled with Congress to protect from such indignity when they enacted the TCPA. The dictionary supports this as a possible interpretation, and the legislative history certainly contemplates any agentless communication being an artificial or prerecorded voice. Accordingly, canons of construction strongly support Plaintiff's reading of the statute.

### C. **Plaintiff's Complaint Adequately Alleges The Text Messages Were Solicitations**

Despite knowing and citing to the exceedingly liberal pleading standards at issue on a Motion to Dismiss, Defendant takes a shot at arguing that Plaintiff has not adequately alleged that the text messages at issue were "telephone solicitations" within the meaning of the TCPA. But, its argument is based on purposefully ignoring Plaintiff's allegations, which is not the right standard on a motion to dismiss.[16] The TCPA defines "telephone solicitation" to mean a message sent "for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services." 47 U.S.C. § 227(a)(4). Plaintiff alleged that Defendant sent Plaintiff multiple text messages soliciting its business to Plaintiff in April 2020. TAC at ¶ 44. Plaintiff alleged elsewhere that such text messages were "spam advertisements" and/or "promotional offers" and that "Defendant sought to solicit its 'rewards' and other associated promotions." *Id.* at ¶¶ 18-19. Such allegations are factual allegations and not just simply parroting the statute—they are pleading facts that the contents of Defendant's text messages were trying to have Plaintiff purchase using Defendant's promotional offers, which are invitations to purchase Defendant's services.

The cases cited by Defendant are inapposite to these facts. *Rotberg v. Jos. A. Bank Clothiers, Inc.*, 345 F. Supp. 3d 466, 471 (S.D.N.Y. 2018) alleged a rewards program sign-up text and opt out text with the specific language of those messages, which allowed

---

[16] Defendant cites ONLY to ¶ 45 which simply lays out the definition of "telephone solicitation," and ignores Plaintiff's other factual allegations.

the Court to determine they were not solicitations.  In *Daniel v. Five Stars Loyalty, Inc.*, No. 15-CV-03546-WHO, 2015 WL 7454260 (N.D. Cal. Nov. 24, 2015), the plaintiff alleged the specific text of the first text message sent to him which was clearly a rewards program sign-up and thus not a solicitation.  By contrast, there is no specific language here for the Court to analyze to determine whether such messages are solicitations. Instead, the allegations are broadly pled as noting that the content of the messages was soliciting Defendant's business and offering promotions.[17]

The Court in *Huber v. Pro Custom Solar, LLC*, No. 3:19-CV-01090, 2020 WL 2525971, at *3 (M.D. Pa. May 18, 2020) noted this distinction as well in finding that by alleging the defendant sells solar panels and uses telemarketing that was adequate until the liberal standards to state a claim, even if just "barely so."[18]  The Court further noted that "notice pleading standards do not require a plaintiff to allege details at the pleading stage about the time and context of every telephone call." *Id.* (citing *Robinson v. Midland Funding, LLC*, No. 10-CV-2261-MMA-AJB, 2011 WL 1434919, at *3 (S.D. Cal. Apr. 13, 2011)).  Accordingly, Plaintiff has adequately pled sufficient facts to demonstrate the

---

[17] While not inherently applicable to this Motion which looks only on the pleadings, it is worth pointing out that while Defendant's name is Reward Zone USA LLC, its product appears to be having consumers purchase deals through Defendant which "may include mobile games and apps, subscription products and services, free trials and many more [and] [s]ome of the Deals we offer are free, while many require a purchase to complete." *See, e.g., https://rewardzoneusa.com/.*  Plaintiff raises this point solely to point out that there's no reason to believe Defendant is in fact a rewards program.

[18] It is also worth noting that even the content alone may not be enough to make such a determination, as the Ninth Circuit has held that it is the motivation of the sender which may define the purpose of the text. *See Chesbro v. Best Buy Stores, L.P.*, 705 F.3d 913, 918 (9th Cir. 2012) (rejecting defendant's argument that its calls to plaintiff were purely informational where the calls urged the plaintiff "to 'redeem' his Reward Zone points, directed him to a website where he could further engage with the [Reward Zone Program], and thanked him for 'shopping at Best Buy.' "); *see also Weisbein v. Allergan, Inc.*, No. SACV200801FMOADSX, 2021 WL 1034979, at *3 (C.D. Cal. Mar. 16, 2021) (finding that an informational text message which was proceeded by text messages selling Botox still constituted a solicitation call).

text messages were "telephone solicitations" and thus state a claim under (c) of the TCPA.

### D. **The Proper Course Of Action, Should The Court Grant Defendant's Motion, Is A Grant Of Leave To Amend**

Federal Rule of Civil Procedure 15(a) provides that a trial court shall grant leave to amend freely "when justice so requires." The Supreme Court has stated that "this mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Review of denial of leave to amend is strictly reviewed in light of the strong policy permitting amendment. *Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 798 (9th Cir. 1991). Defendant's challenges to Plaintiff's first two causes of action are, effectively, legal challenges such that unless the Court rules Plaintiff has failed to plead those two causes with adequate specificity (which seems unlikely), Plaintiff does not seek leave to amend those two causes of action.[19]

But, if the Court grants Defendant's motion as to Defendant's challenge to Plaintiff's do-not-call claims under section (c) of the TCPA and as encapsulated within the third and fourth cause of action, Plaintiff seeks leave to amend freely with additional facts regarding the specific content of the messages which further demonstrates Plaintiff's factual allegations that such text messages were soliciting Defendant's business to meet that low burden. Plaintiff's amendments would not be "futile" as they could add additional facts and documents to support his claims at the pleading stage, if the Court rules it to be required. Further, this is Defendant's first challenge to the pleadings such that it is also Plaintiff's first opportunity to amend to the extent the Court finds such challenge persuasive.

### V. **CONCLUSION**

Plaintiff respectfully request the Court deny Defendant's Motion in full. To the extent the Court grants the Motion as to the do-not-call claims (Claims 3 and 4), Plaintiff

---

[19] Though Plaintiff obviously maintains that deciding the issue regarding ATDS is premature on a Motion to Dismiss as the exact nature of the system is only fully determined in discovery.

respectfully requests leave to add further detail about how the text messages were clearly solicitation text messages attempting to induce Plaintiff to purchase Defendant's services.

Dated:  December 22, 2021                LAW OFFICES OF TODD M. FRIEDMAN P.C.


                                         By:   /s/ *Todd M. Friedman*
                                         Todd M. Friedman, Esq.
                                         *Attorneys for Plaintiff*

1

2

**PROOF OF SERVICE BY ELECTRONIC POSTING**

3

I, the undersigned say:

4

5

I am not a party to the above case, and am over eighteen years old.  On December

6

22, 2021, I served true and correct copies of the following document, by posting the

7

document electronically to the ECF website of the United States District Court for the

8

9

Central District of California, for receipt electronically by the parties listed on the Court's

10

Service List.

11

I affirm under penalty of perjury under the laws of the United States of America

12

13

that the foregoing is true and correct.  Executed on December 22, 2021, at Los Angeles,

14

California.

15

16

                              *s/ Todd M. Friedman*
                              Todd M. Friedman

17

18

19

20

21

22

23

24

25

26

27

28

PLF'S OPP. TO DEF.'S MTD